# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| EVELYN C. BARNES, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3:05-0583** |
| **v.** | ) | **Judge Nixon / Knowles** |
| | ) | |
| JO ANNE BARNHART, | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security which found that Plaintiff was not disabled and which denied Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on Plaintiff's "Motion for Judgment." Docket Entry No. 13. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 15.

For the reasons stated below, the undersigned recommends that Plaintiff's "Motion for Judgment" be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

Plaintiff filed her application for Disability Insurance Benefits on June 7, 2001, alleging that she had been disabled since April 25, 2000, due to pain in her lower back and depression.

1

*See, e.g.,* Docket Entry No. 9, Attachment ("TR"), p. 22. Plaintiff's application was denied both

initially (TR 46) and upon reconsideration (TR 48). Plaintiff subsequently requested (TR 57)

and received (TR 60) a hearing. Plaintiff's hearing was conducted on June 27, 2003, by

Administrative Law Judge ("ALJ") William F. Taylor. TR 361-373. Plaintiff and Vocational

Expert, Rebecca Williams, appeared and testified. TR 361.

On October 21, 2003, the ALJ issued a decision unfavorable to Plaintiff, finding that

Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR

18-34. Specifically, the ALJ made the following findings of fact:

1. The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits as set forth in Section 216(i) of the Social Security Act. She is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b).

4. The claimant's medically determinable impairments do not meet or medically equal the criteria of any listed impairment in Appendix 1, Subpart P of Regulation No. 4.

5. The undersigned finds that the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

7. The claimant retains the residual functional capacity to perform "light" work. She could lift and carry 20 pounds occasionally and 10 pounds frequently. She could sit for 6 hours and stand/walk for 6 hours in an 8-hour workday but

2

would need the option to alternate sitting and standing throughout the workday. The claimant's ability to remember, understand, and carry out instructions is not significantly limited. She is able to maintain adequate concentration, persistance [*sic*], and pace and is not significantly limited in her ability to deal with the general public, co-workers, or supervisors.

8. Because her past job does not allow the claimant to alternate sitting and standing, she is unable to perform any of her past relevant work (20 CFR § 404.1565).

9. The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1563).

10. The claimant has a "high school education" (20 CFR § 404.1564).

11. The claimant has transferable skills from semi-skilled work previously performed (20 CFR § 404.1568).

12. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

13. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.22 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such medium, semi-skilled jobs include work as a machine operator, an assembler, and an inspector. Sedentary, semi-skilled jobs that the claimant could perform include cashier, information clerk, receptionist, teacher's aide, assembler, inspector, and general laborer.

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

TR 33-34.

On October 29, 2003, Plaintiff timely filed a request for review of the hearing decision.

3

TR 16.  On January 29, 2005, the Appeals Council issued a letter declining to review the case

(TR 7-9), thereby rendering the decision of the ALJ the final decision of the Commissioner.

This civil action was thereafter timely filed, and the Court has jurisdiction.  42 U.S.C. § 405(g).

If the Commissioner's findings are supported by substantial evidence, based upon the record as a

whole, then these findings are conclusive.  *Id.*

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

Plaintiff alleges disability due to lower back pain and depression.  TR 22.

On September 19, 1996, Robert M. Dimick, M.D., completed a Work Status Form

regarding Plaintiff.  TR 145.  Dr. Dimick indicated that Plaintiff could "return to limited duty,"

and specified that she could sit 45 minutes and stand or walk 15 minutes each hour, working 4

hours a day for 2 weeks.  *Id.*

On March 13, 1998, radiologist Steven Tishler, M.D., completed an Imaging

Consultation Report regarding Plaintiff's CT L-Spine without Contrast.  TR 146.  Dr. Tishler

reported that the results of the examination indicated bilateral cysts posterior to the S2 vertebral

body, larger on the left than on the right; that the right Tarlov cyst freely communicated with the

CSF space; and that the left Arachnoid cyst was poorly opacified, compressed the left S2 nerve

root, and was predominantly interosseous/intraforamenal in location.  *Id.*  He further noted that

there was no evidence of disc herniation at L5-S1 or L4-L5, and that the central canal was

maintained.  *Id.*

On August 21, 1998, Sally J. Killian, M.D., of the Nashville Medical Group, saw

Plaintiff for a consultation on chronic coccygeal pain.  TR 175-177.  Dr. Killian's notes indicate

4

that Plaintiff's job required her to sit in a chair and answer a phone for 8 hours a day, with two

15-minute breaks and a 30-minute lunch.  TR 175.  Dr. Killian also reported that Plaintiff's past

treatment had included local steroid injections in the coccygeal area, a variety of nonsteroidal

anti-inflammatory agents, Ultram, and muscle relaxants, none of which gave her relief, and that

she was managing pain with hydrocodone.  *Id.*  Dr. Killian further noted that Plaintiff reported

feeling "powerless and abused" by her employers, who had overruled a physician's dispensation

to stand or walk 15 minutes each hour.  *Id.*  Dr. Killian also indicated that Plaintiff stated that she

had a history of anxiety attacks, "a considerable amount of work stress," and "significant

depression" related to work, as well as financial strains related to her own and her husband's

children from previous marriages, but that her husband was "supportive."  TR 175-176.  On

physical examination, Dr. Killian reported that Plaintiff was in "no acute distress."  TR 176.  Dr.

Killian's impression was sacral coccygeal pain with sacral cysts identified on MRI that were

possibly the cause of her pain, a history of emphysema, and depression.  *Id.*  Dr. Killian gave

Plaintiff  #40 Vicodin for pain and Zoloft.  TR 177.

On September 4, 1998, Plaintiff returned to Dr. Killian for follow-up.  TR 174.  Notes

indicate that Plaintiff reported that Zoloft "may be helping," and that Plaintiff's pain was not

consistent with anatomical abnormalities.  *Id.*  Dr. Killian's notes include her plan to continue

Zoloft and write a letter recommending that Plaintiff work under a sit-stand option.  *Id.*

On October 2, 1998, Plaintiff returned to Dr. Killian for follow-up.  TR 174.  Notes

indicate that Plaintiff was "feeling better" because she had been assigned a new office, that she

had stopped Zoloft, looked calmer, and was coping better.  *Id.*

On November 30, 1998, Plaintiff returned to Dr. Killian for follow-up.  TR 173.  Notes

indicate that Plaintiff complained of increased pain for 4 weeks, which she described as "burning," "stabbing," and radiating up the right buttocks and down the back of both thighs. *Id.* Notes also indicate that Plaintiff recently had been told that she had to return to her former "job that she dislikes and finds very stressful." *Id.* Dr. Killian planned to renew Vicodin, order NCS/EMG testing, and consider pain clinic. *Id.*

On December 7, 1998, Brian M. Thompson, M.D., performed neurodiagnostic testing on Plaintiff and recorded his impression that there was no definite electrophysiologic evidence of neuropathy, myopathy, or lumbosacral radiculopathy or other denervation, but that a minimal peroneal latency delay was possibly technical or very early peroneal neuropathy. TR 186-187. Dr. Thompson recommended further clinical correlation. TR 187.

On January 4, 1999, Plaintiff returned to Dr. Killian for follow-up. TR 172. Notes indicate that Plaintiff reported doing mandatory overtime at work, but had a chance to move to a new office with a new supervisor. *Id.* Dr. Killian also noted that Plaintiff's congested head and chest were better, but not resolved, and planned to limit Vicodin. *Id.*

On February 5, 1999, Plaintiff returned to Dr. Killian with complaints of fatigue, right ear pain, and cough. TR 171. Dr. Killian noted that Plaintiff could return to work on Monday, February 8. *Id.*

On March 23, 1999, Plaintiff went to Dr. Killian with complaints of pain and bruises after falling down the stairs and hitting her left side, including her head. TR 170. Notes indicate that the fall increased Plaintiff's lower back pain, and that Dr. Killian prescribed Tylenol, extra Vicodin, and staying off work until March 25. *Id.*

On May 19, 1999, Plaintiff returned to Dr. Killian with complaints of back problems and

6

depression.  TR 169.  Notes indicate that Plaintiff was "in tears" because she could not "handle" her job due to "too much pressure" and "too little time to do the work correctly."  *Id.*  Dr. Killian further reported that Plaintiff had not worked in 2 weeks, but had gotten in her car and started to go to work, but turned around and returned home.  *Id.*  Dr. Killian prescribed Serzone, staying off work for 2 weeks, and requesting a job transfer.  *Id.*

On June 2, 1999, Plaintiff returned to Dr. Killian for follow-up.  TR 168.  Notes indicate that Plaintiff stated that she did not tolerate Serzone, but did better on Zoloft and being away from work, and that she worried about returning to her job.  *Id.*  Notes further indicate that Plaintiff described conflicts between her husband and her son, and between her and her husband over their financial situation if she did not work, including his threats of divorce.  *Id.*  Dr. Killian noted that Plaintiff was well-groomed, did not cry, and had "good thought processes," and that her depression was "primarily related to work stress."  *Id.*  She prescribed Zoloft, discontinued Serzone, and advised Plaintiff to call human resources.  *Id.*

Plaintiff returned to Dr. Killian with complaints of increased back pain.[1]  TR 167.  Notes indicate that Plaintiff stated that her back "hurt" since she had returned to work in a new position, where she had to sit all day, but that she did not want to take medication.  *Id.*  Notes also indicate that Plaintiff was tearful, "less well-dressed," and wore heavy make-up, and that her husband had refused to go to counseling and was jealous.  *Id.*  Dr. Killian planned to refer Plaintiff to mental health, and prescribed trial Celebrex.  *Id.*

On July 29, 1999, Plaintiff began psychiatric treatment with Sue Worrell, LCSW.  TR 152-153.  Ms. Worrell diagnosed Plaintiff with major depression, and estimated that treatment

---

[1] The record does not reveal the date of this visit.  TR 167.

would last through December 31, 1999.  TR 152.  She further noted that Plaintiff's affect was "frustrated," that her behavior was "anxious," that her mood was "depressed and anxious," and that Plaintiff needed psychiatric evaluation to stabilize her mood and decrease her depression, as well as therapy to increase her coping strategies, self care, and stress management.  TR 153.

On August 23, 1999, Plaintiff returned to Dr. Killian for follow-up.  TR 166.  Notes indicate that Plaintiff was not going to work, but that she had been evaluated by a psychologist who "felt that she was able to resume work." *Id.* Dr. Killian reported that Plaintiff's conflicts at home were "escalating," and that "a significant amount" of her depression was related to "non-work situations." *Id.* Dr. Killian further reported that she believed that Plaintiff would "fall apart" if she returned to her previous work environment. *Id.* On August 14, 1999, Dr. Killian signed a letter addressed "To Whom It May Concern," stating her belief that "the reexposure of [Plaintiff] to her previous work site will only exacerbate her current symptoms ... of depression with tearfulness, inability to concentrate, anhedonia, and lack of motivation."  TR 165.

On August 26, 1999, Ms. Worrell saw Plaintiff for a therapy session.  TR 151.  Ms. Worrell indicated that Plaintiff was under "much stress" because of marital difficulties, and that Plaintiff stated that she "cannot return" to work or she would "go over the edge." *Id.*

On September 8, 1999, Renee Glenn, M.D., saw Plaintiff for psychiatric evaluation.  TR 148-150.  Progress notes from the session indicate that Plaintiff had been on medical leave since June from her job as a sales representative at Bell South.  TR 148.  The notes indicate that Plaintiff stated that her job had become "more and more depressing" over the past 2 ½ years, and that she reported "daily sadness with shaking, crying for no apparent reason," insomnia, variable appetite, no energy, poor concentration, and weight loss. *Id.* Family problems, including an

8

attack on Plaintiff by her ex-husband's estranged wife and 2 teenage sons, were "sometimes stressful" and "traumatic." *Id.* The notes further indicate that Plaintiff had been hospitalized overnight in 1988 or 1989 for panic attacks, and that she had been abused physically and emotionally by her third husband. *Id.* Dr. Glenn diagnosed major depression, moderate without psychotic features, and generalized anxiety disorder, and prescribed the antidepressant Imipramine. TR 149-150. Dr. Glenn assessed Plaintiff's GAF as 60. *Id.*

On September 21, 1999, Plaintiff returned to Dr. Killian with complaints of a "painful" bump on her tailbone and back pain. TR 164. Notes indicate that Plaintiff had returned to work "on threat of being fired" and that her home life was "a bit calmer," although her husband remained jealous. *Id.* Notes also indicate that Plaintiff had a nodular erythematous lesion between her buttocks, but no deep induration. *Id.* Dr. Killian prescribed Augmentin and recommended that Plaintiff continue counseling and Imipramine. *Id.*

On November 2, 1999, Plaintiff returned to Dr. Killian for follow up. TR 163. Notes indicate that Plaintiff had not been taking Imipramine or going to counseling, but had returned to work. *Id.* Dr. Killian noted that Plaintiff's back pain had increased and was chronic, and she prescribed Vioxx. *Id.* On the same day, Dr. Killian signed a note recommending that Plaintiff "be allowed to get up and walk when needed" to help relieve back pain. TR 314.

On December 3, 1999, Plaintiff returned to Dr. Killian with complaints of neck spasms, knots, and "overwhelming fatigue." TR 160. Notes indicate that Plaintiff stated that her home situation had become worse because her husband was drinking, threatening, and frightening her and her 15-year-old with paranoid talk, and that she was sleeping on the loveseat, but was not sleeping well. *Id.* Dr. Killian prescribed Flexeril and encouraged her to leave her husband. *Id.*

9

Dr. Killian also ordered laboratory testing for Plaintiff on the same day. TR 161-162. All results, reported by LabCorp, were within the normal reference interval. *Id.*

On January 31, 2000, Dr. Killian wrote a letter to Kemper National Services Incorporated concerning Plaintiff's absence from work the past year. TR 158-159. Dr. Killian summarized her treatment of Plaintiff and noted that she had advised that Plaintiff take time off work, but that her psychologist had believed Plaintiff could return to work, resulting in an unexcused absence on her work record. *Id.*

On February 9, 2000, Plaintiff returned to Dr. Killian with complaints of pain after being hit in the tailbone with a door knob at work. TR 157. Notes indicate that there was no bruising, swelling, or other evidence of injury, and that the injury Plaintiff described should not have affected her sacral cyst. *Id.* Dr. Killian prescribed Vioxx and recommended that Plaintiff return to work in the morning. *Id.* On February 11, 2000, Dr. Killian described Plaintiff's door knob incident in a letter to Kemper National Services, stating that Plaintiff had not returned to work since she was seen by an Occupational Health Physician the day after the injury, but that Plaintiff showed no sign of injury "significant enough to have caused any damage to her pre-existing condition," and that she "should have been able to return to work the day of the injury." TR 156.

On March 13, 2000, Ms. Worrell noted that, since Plaintiff had been last seen by Dr. Glenn on October 6, 1999, Plaintiff had not kept appointments or made contact. TR 147. Her case was terminated with a discharge diagnosis of major depression. *Id.*

On June 7, 2000, Thomas Tompkins, M.D., referred Plaintiff to Star Physical Therapy for therapeutic exercise twice a week for 2-3 weeks. TR 220. The same day, Plaintiff completed a

10

Patient Questionnaire - Extremity for Star Physical Therapy, indicating that she rated her pain at 5/10, that she felt aching pain in her right knee and stabbing pain above the kneecap, and that her symptoms had begun with her knee surgery on May 25, 2000.[2] TR 218-219. Plaintiff began treatment with physical therapist Jennifer Duncan, P.T., on June 8, 2000. TR 217. Ms. Duncan treated Plaintiff again on June 12, June 15, and June 19, 2000, noting on each visit that Plaintiff was "compliant" and did "well" with home exercise, and that she tolerated treatment "well" and made "progress per treatment plan." TR 214. On June 21 and June 28, 2000, Ms. Duncan noted that Plaintiff continued to be "compliant" and "do well" with home exercises, tolerated treatment "well," and made "progress per treatment plan," noting on June 28 that Plaintiff's swelling had decreased. TR 207. On June 30, 2000, however, Plaintiff's insurance stopped covering her physical therapy and she "had to go home." *Id.* Plaintiff did not appear for her appointment on July 6, 2000. TR 206. On July 26, 2000, Ms. Duncan completed a Discharge Summary Form listing Plaintiff's date of discharge as June 28, 2000. TR 205.

On June 28, 2000, Dr. Tompkins recommended continuing physical therapy twice a week for 3 weeks. TR 210.

On August 4, 2000, Plaintiff went to Dr. Killian for a routine check-up and complaining of increased lower back pain. TR 155. At Plaintiff's request, Dr. Killian planned to write a note to Plaintiff's workplace to allow hourly standing. *Id.*

On October 16, 2000, Plaintiff saw Rex E. H. Arendall, II, M.D., for neurosurgical consultation. TR 315. Dr. Ardendall noted that Plaintiff had a history of back and bilateral leg pain, right greater than left, with numbness in the big toe. *Id.* On the same day, Dr. Arendall

---

[2] The Administrative Record does not contain medical records of this surgery.

Case 3:05-cv-00583   Document 16   Filed 07/26/06   Page 11 of 48 PageID #: 83

signed a Patient Disability Statement indicating that Plaintiff was scheduled to undergo surgery for a lumbar arachnoid cyst in January 2001. TR 314.

On October 17, 2000, Plaintiff saw William S. Witt, M.D., for an MRI of the lumbar spine. TR 319. The MRI results indicated "minor" bilateral articular facet hypertrophy at L4-5, "mild to moderate" bilateral articular facet hypertrophy at L5-S1, and perineural cysts at the S2 level, with the S2 neural foramen "markedly" remodeled by the cyst on the left. *Id.*

On October 20, 2000, Dr. Arendall noted that an MRI of the lumbar showed "no significant disc abnormality," but did show 2 "moderately large" sacral cysts, the one on the left larger, apparently compressing the left S-2 nerve root, and surrounded by some sclerosis. TR 310. On the same day, Dr. Arendall signed a letter addressed to Plaintiff outlining her options for treatment of the cysts revealed by the MRI scan. TR 312. Dr. Arendall noted that both cysts were benign, but could enlarge and cause nerve compression, and that the one on the left had already caused bone erosion. *Id.*

On November 20, 2000, Dr. Arendall completed a Return to the Office to Discuss Surgery form regarding Plaintiff. TR 309. Dr. Arendall indicated that he and Plaintiff had discussed conservative and surgical treatment options, and that Plaintiff wished to go ahead with surgery. *Id.*

On November 24, 2000, Dr. Arendall's records indicate that Plaintiff called to request Lortab, stated she had "run out." TR 307. She was "tearful" when her request for a Vicodin prescription was refused, and she was told that no medications could be called in for her over the weekend or holiday. *Id.* Records further indicate that, when the nurse called Plaintiff's pharmacy to order pain medication for her, the pharmacist told her that Plaintiff had been

receiving pain medication prescribed by both Dr. Killian and Dr. Arendall since September 26, and that the pharmacy felt that this was "a red flag." TR 308.

On November 27, 2000, Dr. Arendall noted that he had sent a brace approval letter. TR 309.

On November 30, 2000, Dr. Arendall indicated that Plaintiff was in "severe" pain and would remain off work. TR 309.

On January 11, 2001, Plaintiff was admitted to the Centennial Medical Center for a lumbosacral laminectomy with excision of cyst by Dr. Arendall. TR 178-185. Dr. Arendall noted that Plaintiff had a history of back and bilateral leg pain, right greater than left, associated with numbness and tingling, and that all conservative treatment had failed. TR 178. His final diagnosis was "arachnoid cyst." *Id.*

Dr. Arendall further noted that, after surgery, Plaintiff had no complications, was ambulating satisfactorily, and was healing well. *Id.* She was discharged on January 13 with the medication Colace. *Id.* A pathology report by Dean G. Taylor, M.D., concerning the material removed from Plaintiff did not show any evidence of inflammation, neoplasm, or arachnoid membrane. TR 183-184.

On January 18, 2001, Dr. Arendall signed a Physician Report for Kemper National Services, Inc., stating that Plaintiff was not able to work full duty or with restrictions due to surgery for a lumbar arachnoid cyst. TR 306.

On January 29, 2001, Dr. Arendall completed a Return Office Visit form regarding Plaintiff. TR 302-305. The report indicates that Plaintiff rated her pain as 5/10 and was being treated with Lortab 10. TR 302.

13

On February 7, 2001, Dr. Arendall signed a Physician Progress Report for Kemper National Services, Inc., regarding Plaintiff. TR 301. The report indicates that Plaintiff's leg pain was "better," that she still had back pain, and that she was to stay off work until April 2, 2001. *Id.*

On April 2, 2001, Dr. Arendall completed a Return Office Visit form regarding Plaintiff. TR 297-300. The report indicated that Plaintiff's chief complaint was pain in the left tailbone and left leg, that the treatment plan was physical therapy, and that Plaintiff was limping and had decreased S1 sensation, but that her lumbar radiculopathy was resolving. *Id.* On the same day, Dr. Arendall referred Plaintiff to physical therapy. TR 203.

On April 9, 2001, Plaintiff completed a Patient Questionnaire-Spine for Star Physical Therapy. TR 200-202. Plaintiff indicated that she had not returned to work since her surgery of January 11, 2001. *Id.* She also noted that her then-current symptoms had begun in 1996, and included back and leg symptoms that were becoming worse, and were worse when sitting and sleeping, but better when lying. TR 200. Plaintiff described her back pain as 7/10 and "stabbing," and her leg pain as 7/10 and "aching." TR 202. Physical therapist Jennifer Duncan's evaluation indicated that Plaintiff's rehabilitation potential was "good" and that she tolerated the treatment "well." TR 201.

On April 10, April 16, and April 18, 2001, Ms. Duncan reported that Plaintiff tolerated treatment "well" and made "progress per treatment plan." TR 198. On April 20, 2001, Ms. Duncan noted that Plaintiff had a "bad headache," had to lie down, and was nauseous. TR 197. Ms. Duncan reported that Plaintiff was "compliant" with home exercise. *Id.*

On April 11, 2001, Dr. Arendall's records indicate that Plaintiff "no showed" for a CT

14

scan. TR 307.

On April 24, 2001, Mark L. Born, M.D., reported on a CT scan of Plaintiff's lumbar spine with multiplanar reconstructions. TR 318. Dr. Born indicated that the prior left S1 partial laminectomy expanded the bony sacral canal on the left, with scarring posterior to the canal, and a low-density lesion typical of a Tarlov cyst of the nerve roots expanded the left sacral canal. *Id.*

On April 27, 2001, Dr. Arendall's records indicate that Plaitniff's CT scan showed that the bone remained thin and that this "would explain her difficulty with sitting." TR 296. On the same day, Dr. Arendall wrote a letter to Plaintiff explaining that the CT scan showed that the cyst had left a large cavity in the bone and suggesting that she continue physical therapy to strengthen the area. TR 295.

On April 27, 2001, Ms. Duncan noted that Plaintiff was "compliant" but "partial" in performing home exercises, and Ms. Duncan noted on May 2 and May 9, 2001, that Plaintiff complained of lower back pain. TR 204. On each of these dates, Ms. Duncan reported that Plaintiff tolerated treatment "well" and made "progress per treatment plans." *Id.* On May 10, 2001, Ms. Duncan's progress notes indicated that Plaintiff had 3 cancellations and/or no-shows, but that her participation was "good." Ms. Duncan further noted that Plaintiff had complained of frustration, that she was "still in the same amount of pain prior to surgery," and that prolonged sitting and stress produced her pain. TR 193.

On May 31, 2001, Ms. Duncan completed a Discharge Summary Form, indicating that Plaintiff had been discharged on May 11, 2001, with a home exercise program, but without achieving goals regarding pain and range of motion. TR 189.

On June 11, 2001, Dr. Arendall completed a Return Office Visit form regarding Plaintiff.

TR 291-294.  Notes indicate that Plaintiff complained of right leg pain, pain in the saddle area, "worse" pain when sitting and standing, and more pain on the right than the left.  TR 291.  The report further indicates that Plaintiff's gait was antalgic, sensation was decreased in the right S1, and a recurrent cyst was present.  TR 293-294.

On June 25, 2001, Dr. Born saw Plaintiff for coccygeal pain and radiculopathy in both lower extremities.  TR 316-317.  Lumbar spine films, lumbar puncture with intrathecal contrast administration, lumbar myelogram, and a CT scan of the lumbar spine with intrathecal contrast post myelogram indicated expansion of the sacral spinal canal on the left, attributed to a Tarlov cyst, but no demonstrated disc herniations.  *Id.*

On July 13, 2001, Dr. Arendall wrote a letter to Disability Examiner Damon Jennings, stating his opinion that Plaintiff was "medically disabled."  TR 290.

On July 18, 2001, Scott J. Gale, Ed.D., a clinical psychologist, assessed Plaintiff in conjunction with her application for Social Security benefits.  TR 221-226.  He noted that Plaintiff rated her pain as an 8 or 9 out of 10, and her depression as a 9.  TR 223.  He noted that Plaintiff described symptoms of loss of interest, guilt, difficulties with concentration, sleep disturbance, fatigue, variable appetite, suicidal ideation, anxiety, irritability, and tearfulness.  TR 224.  He further noted that Plaintiff experienced panic attacks "once or twice a month" and "may be coming [*sic*] somewhat phobic to public places," but that she showed no other phobias, obsessions, compulsions, or illogical thought processes.  *Id.*  He also noted that Plaintiff said that she "frequently" thought about suicide, but did not want to hurt her children.  TR 225.  Dr. Gale indicated that Plaintiff described her daily activities as mostly limited to her bedroom, where she had a television, computer for e-mail, and novels that she enjoyed reading.  *Id.*  Dr. Gale further

16

noted that Plaintiff reported that she ate dinner with her husband, but that he had a separate bedroom. *Id.* Dr. Gale diagnosed depressive disorder NOS, anxiety disorder NOS with features of panic disorder/agoraphobia, and psychological factors affecting medical condition, and rated her then-current GAF at 48. TR 226. His functional assessment indicated that Plaintiff was able to sustain concentration and persistence, to interact socially without marked limitation, and to respond appropriately to changes in the work setting. *Id.*

On July 24, 2001, Bruce A. Davis, M.D., completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) regarding Plaintiff. TR 227-228. Dr. Bruce indicated that Plaintiff retained the capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk less than 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. TR 227-228. Dr. Bruce also indicated that Plaintiff should avoid bending, squatting, and irritating inhalants. TR 228. On the same day, Dr. Bruce also completed an Office Visit Report regarding Plaintiff, in which he indicated that she had normal gait and reflexes, but increased expiratory phase with coarse breath sounds. TR 229. Dr. Born also saw Plaintiff on July 24, 2001, and reported no abnormality of the lumbar spine. TR 230. Spirometry testing on the same day, signed by Dr. Bruce, indicated "mild obstruction." TR 231.

On September 4, 2001, James S. Walker, Ph.D., completed a Mental Residual Functional Capacity ("RFC") form regarding Plaintiff. TR 234-237. Dr. Walker indicated that Plaintiff's ability to understand and remember detailed instructions was moderately limited, but other aspects of understanding were not significantly limited; that her ability to carry out detailed instructions, her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and her ability to complete a normal workday and

Case 3:05-cv-00583   Document 16   Filed 07/26/06   Page 17 of 48 PageID #: 89

workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods were moderately limited, but other aspects of sustained concentration and persistence were not significantly limited; that her ability to interact appropriately with the general public was moderately limited, but all other aspects of social interaction were not significantly limited; and that no aspects of adaptation were significantly limited. TR 234-235. Dr. Walker's RFC Assessment was that Plaintiff could "understand/recall/perform detailed instructions," could "sustain schedule, persistence and pace with occasional lapses," and was "otherwise not mentally limited." TR 236.

Also on September 4, 2001, Dr. Walker completed a Psychiatric Review Technique Form regarding Plaintiff. TR 238-251. Dr. Walker indicated that Plaintiff suffered from Anxiety Disorder NOS, evidenced by her reluctance to leave home, and Personality Disorder evidenced by "persistent disturbances of mood or affect." TR 243, 245. He ranked her degree of functional limitation as "moderate" for Restriction of Activities of Daily Living; "moderate" for Difficulties in Maintaining Social Functioning; "moderate" for Difficulties in Maintaining Concentration, Persistence, or Pace; and "none" for Repeated Episodes of Decompensation, Each of Extended Duration. TR 248.

On September 10, 2001, Dr. Arendall completed a Return Office Visit form regarding Plaintiff. TR 285-288. The report indicates that Plaintiff continued to complain of pain in the right sacral area when sitting or driving, and some pain down the right S1, stopping at the calf. TR 285. The report further indicates that Plaintiff would be treated with Lortab and Soma, that her gait was antalgic, that she had decreased sensation in the right S1, and that her lumbar

radiculopathy was "stable" with "less" S1 pain.  TR 285-288.

On October 1, 2001, Dr. Arendall completed a "Medical Source Statement to Do Work-Related Activities (Physical)" form regarding Plaintiff.  TR 252-254.  Dr. Arendall indicated that Plaintiff could lift and/or carry 25 pounds occasionally and 10 pounds frequently, stand and/or walk 2 hours total and 15 minutes without interruption in an 8-hour workday, and sit 2 hours total and 15 minutes without interruption in an 8-hour workday.  TR 252.  Dr. Arendall further indicated that Plaintiff could never climb, balance, stoop, crouch, kneel, or crawl; and that reaching, handling, feeling, seeing, hearing, and speaking were unaffected, but that pushing/pulling should be limited to 10 pounds.  TR 253.  Dr. Arendall further imposed restrictions on heights and on moving machinery.  *Id.*

On October 29, 2001, Dr. Arendall wrote a letter to Disability Examiner Michael Headrick, stating his opinion that Plaintiff was "medically disabled."  TR 284.

On November 19, 2001, K. Duncan, RNFNP, at Dr. Arendall's office, reported that Plaintiff complained that her back felt "weak," that she could not sit or stand for long periods, that she still had muscle spasms, that she had pain in the inner and upper right thigh but not down the right leg, and that she was depressed.  TR 283.  Nurse Duncan's treatment plan included physical therapy 3 times a week for 3 weeks and refilling prescriptions.  *Id.*

On November 28, 2001, Celia M. Guldenk, M.D., completed a Physical RFC Assessment regarding Plaintiff.[3]  TR 255-262.  Dr. Guldenk indicated that Plaintiff retained the capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday.  TR 256.  Dr. Guldenk

_____

[3] Dr. Guldenk's handwritten notes are generally illegible.  TR 256-259.

further indicated that Plaintiff's ability to push and/or pull was unlimited. *Id.* Dr. Guldenk also indicated that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, or crawl, and imposed no manipulative, visual, communicative, or environmental limitations. TR 257-262.

The record also contains an undated, unsigned Physical RFC Assessment. TR 263-270. This assessment indicates that Plaintiff retained the capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. TR 264. The assessment further indicates that Plaintiff retained an unlimited capacity to push and/or pull, that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl, and that no manipulative, visual, communicative, or environmental limitations were established. TR 264-267.

On November 30, 2001, Dr. Arendall's records indicate that Star Physical Therapy called to get approval for Plaintiff to do aquatic therapy because of her "low endurance." TR 283.

On March 28, 2002, Nurse Duncan completed a Return Office Visit form regarding Plaintiff. TR 282. The report indicates that Plaintiff's chief complaint was that her back felt "weak" and that she had pain with prolonged standing. *Id.* The report also indicates that Plaintiff reported that the aquatic therapy "helped," but that Paxil and Zoloft made her nauseous. *Id.*

On April 18, 2002, Nurse Duncan reported that she had called Plaintiff at home to give her her CT results, and that Plaintiff stated that her pain medications were not working. TR 281.

On August 1, 2002, Nurse Duncan completed a Return Office Visit form regarding Plaintiff. TR 277-280. The report indicates that Plaintiff's chief complaints were back, leg, and groin pain, that she had no improvement in her ability to stand or do activities, and that she lay

20

around and did not exercise because of pain. TR 277. The report also indicates that she walked with a limp, but that her muscle strength in the lower extremities was at 5/5 bilaterally and she had no decreased sensation. TR 279.

On October 2, 2002, Dr. Born reported that a CT scan of Plaintiff's lumbar spine with multi-planar reconstructions indicated expansion of the sacral canal at S2-S3 on the left, associated with a Tarlov cyst, left partial laminectomy L5-S1, and no significant change from a prior scan of April 8, 2002. TR 272.

On October 3, 2002, Nurse Duncan completed a Return Office Visit form regarding Plaintiff. TR 273-276. The report indicates that Plaintiff complained of "hurting worse" in the hips and back, feeling "much worse – aching and hurting all the time" in the lower back and both legs, and being unable to work or sleep because of pain. TR 273. The report further indicates that Plaintiff was taking four to five Lortab daily. *Id.* Nurse Duncan's new treatment plan was to stop Lortab and prescribe Tylenol #3 and Celexa, refer Plaintiff to another doctor for pain management, and "send letter for TLSO brace." *Id.* The report also indicates that Plaintiff was walking with a limp but had no atrophy, abnormal movement, or decreased sensation. TR 275. She also had muscle strength at 4+/5 in the lower extremities. *Id.*

On October 28, 2002, Nurse Duncan reported that Plaintiff had called to request Lortab and a substitution for Celexa. TR 336.

On December 3, 2002, Nurse Duncan completed a Return Office Visit form regarding Plaintiff. TR 334-335. The report indicates that Plaintiff's chief complaint was back and left leg pain, that she believed Lortab helped more than Tylenol, and that she stayed in bed "most of the time." TR 334. The report further indicates that Plaintiff walked with a limp, but did not have

21

atrophy, abnormal movements, or decrease in sensation, and had lower extremity muscle

strength at 4+/5 bilaterally.  TR 335.

On January 21, 2003, Nurse Duncan completed a Return Office Visit form regarding

Plaintiff.  TR 333.  The report indicates that Plaintiff came for additional Lortab after running

out early because of taking extra medication, and that she became "loud and tearful" when Nurse

Duncan told her that her prescription could not be refilled that day because of new state laws.  *Id.*

The report further indicates that Plaintiff reported pain in her back and left leg that became worse

with any activity and was not helped by any treatment.  *Id.*

On January 28, 2003, Plaintiff was seen for pain management consultation by John W.

Culclasure, M.D.  TR 328-332.  Dr. Culclasure's report indicates that Plaintiff's chief complaints

were sacral pain, low back pain, bilateral post thigh and calf pain, and bilateral radiating pain

into the perineum.  TR 328.  The report further indicates that Plaintiff stated that her pain

intensity was usually 8/10, and that her pain had been present since 1996, was constant, and was

caused by bone erosion from a sacral cyst.  *Id.*  The report further indicates that Plaintiff

described the pain as "sharp" and "unbearable."  *Id.*  She stated that lying down made it better,

but that "standing/sitting, depression, [being] nervous, [and] damp or cold weather" made it

worse, that physical therapy had been helpful, but that surgery had not.  TR 328-329.  At the

time, Plaintiff was taking four to five tablets of Lortab 10 and less than one tablet of Soma per

day for pain.  *Id.*  The report further indicated that review of Plaintiff's systems revealed weight

gain, generalized weakness, emphysema, frequent urination, loss of interest in sex, muscle pain,

joint pain, muscle weakness, dry skin, depressed mood, thoughts of suicide, waking in the

middle of the night, feelings of doom or dread, feelings of hopelessness, treatment for

22

depression, and cold intolerance.  TR 329-330.  The report also indicated, however, that

Plaintiff's lymphatic system, skin, and mental status were "normal," that her range of motion

was within normal limits, and that her muscle strength and tone in the lower extremities was

normal.  TR 331.  Dr. Culclasure's reported impressions were lumbar post-laminectomy

syndrome, lumbar radiculopahty, sacral pain, Tarlov cysts, sleep disturbance, emphysema,

adjustment reaction with anxiety and depression, status post hysterectomy, status post

arthroscopic knee surgery, and status post lung surgery.[4]  TR 332.  Dr. Culclasure's treatment

plan was to initiate evaluation and treatment protocol for radicular/neuropathic pain, consider a

spinal cord stimulator or pump trial if medication management was ineffective, sign an opiate

agreement, prescribe Neurontin, Kadian, Soma, and Lortab, and have a follow-up visit in 30

days.  *Id.*  The report indicates that Plaintiff had "a very realistic outlook," and that she wanted to

be "more active and productive."  *Id.*

On February 19, 2003, Dr. Arendall completed a Return Office Visit form regarding

Plaintiff.  TR 327.  The report indicates that Plaintiff's chief complaints were back pain and

bilateral hip and leg pain.  *Id.*  The report further indicates that Plaintiff had some problems with

her medications and was "falling due to Kadian."  *Id.*

On February 26, 2003, Dr. Culclasure saw Plaintiff for follow-up.  TR 325-326.  The

report indicates that a lumbar CT scan was taken.  TR 325.  The report also indicates that

Plaintiff complained of back and bilateral leg pain, which she described as "stabbing," "mod.

severe," and "constant," as well as leg joint swelling, muscle spasm, decrease in appetite, crying

easily, waking in the middle of the night, and depressed mood.  TR 326.

--------

[4] The Administrative Record does not contain medical records of this surgery.

On April 2, 2003, Dr. Culclasure saw Plaintiff for follow-up. TR 323-324. The report indicates that Plaintiff's complaints were constant lower back and bilateral leg pain, weight loss, joint pain, leg weakness, limitation of motion, muscle spasm, waking in the middle of the night, and depressed mood. TR 323. Dr. Culclasure prescribed Duragesic for pain. TR 324.

On April 11, 2003, Dr. Culclasure saw Plaintiff for follow-up. TR 321-322. The report indicates that Dr. Culclasure gave Plaintiff new prescriptions for Phenerzan, Benadryl, and Lactulose, refilled Kadian and Lortab, and recommended continuing her then-current medications. TR 321. The report also indicates that Plaintiff's chief complaints were aching and "shooting" constant lower back and bilateral leg pain affected by walking and standing, joint pain, joint swelling, limitation of motion, muscle spasm, back weakness, leg weakness with exertion, and waking in the middle of the night. TR 322.

On July 14, 2003, Dr. Culclasure saw Plaintiff for follow-up. TR 341-342. The report indicates that Plaintiff's chief complaints were constant, aching lower back and bilateral leg pain increased by movement and limitation of motion. TR 341. Dr. Culclasure prescribed Oxycontin in place of Kadian, refilled Lortab, and suggested volunteer work when medications were stable. TR 342.

On October 31, 2003, Dr. Culclasure saw Plaintiff for follow-up. TR 343-344. The report indicates that Plaintiff's chief complaints were constant, aching lower back and bilateral leg pain and limitation of motion, but that she stated that "these meds work much better" and that her pain control was "good." TR 343. Dr. Culclasure's treatment plan was to continue her medications. TR 344.

On March 25, 2004, Dr. Culclasure saw Plaintiff for follow-up. TR 345-346. The report

indicates that Plaintiff's chief complaints were constant, moderate, aching, "sharp" lower back and leg pain affected by standing and sitting, limitation of motion, and muscle spasm.  TR 345. Dr. Culclasure noted that Plaintiff reported that the medications were "very helpful" with pain control.  *Id.*  Dr. Culclasure also noted "evidence of substance abuse or diversion" of Lortab and Oxycontin, and that he discussed with Plaintiff drug tolerance and strategies to keep the pain stable on medications.  TR 346.

On April 7, 2004, Dr. Arendall saw Plaintiff for follow-up.  TR 347.  The report indicates that Plaintiff reported "less leg pain and some back pain," which she rated at 5/10, and which she said increased with activity and decreased with rest.  *Id.*  Dr. Arendall ordered a "lumbar myelo" with "post CT" testing.  *Id.*

On April 8, 2004, Dr. Arendall signed an unaddressed letter stating that Plaintiff should not lift or carry more than 20 pounds occasionally or 10 pounds frequently, should not do any repetitive bending, stooping, or lifting, could not do constant carrying, pushing or pulling, should not sit more than one hour at a time or more than 4 hours total in an 8-hour period, should change positions every 1-2 hours to alternate sitting, standing, or walking to relieve discomfort, should take a break every 2-3 hours and recline for 15-30 minutes if necessary, should not twist, crouch, or climb stairs except on an occasional basis, should never climb ladders or be exposed to heights or moving machinery, and would be absent from work at least 3 times a month.  TR 352.  Dr. Arendall further stated his belief that Plaintiff could not perform sedentary or light work and was "medically disabled."  *Id.*

On April 19, 2004, Dr. Born reported conclusions regarding Plaintiff.[5]  TR 349.  His

_____

[5] The record does not reveal the test from which these conclusions were drawn.  TR 349.

25

report indicates generous spinal canal, generous thecal sac and patent foramina, left partial L5-S1 laminectomy, conjoined left L5-S1 nerve root, relative decreased height of the L1-2 disc, reduced range of motion, and Tarlov cyst expanding the left sacral canal at S2. *Id.*

## B. Plaintiff's Testimony

Plaintiff was 42 years old at the time of the hearing, and has a high school education. TR 364.

The ALJ asked Plaintiff whether she had a driver's license and whether she drove, and Plaintiff answered both questions in the affirmative. TR 364. The ALJ asked whether she smoked, and she answered that she did. *Id.* Plaintiff stated that she smoked one pack a day, but that she did not and never had drunk alcohol or taken street drugs. TR 365. The ALJ asked Plaintiff about her last job. *Id.* Plaintiff answered that she had last worked in April of 2000, as a customer service representative at Bell South. *Id.* Plaintiff reported that that job had entailed sitting, answering calls, and typing. *Id.*

Plaintiff's attorney then questioned Plaintiff about her physical problems. TR 366. Plaintiff answered that she had an arachnoid cyst that eroded the sacrum bone at the end of her spine. TR 367. Dr. Arendall had removed the cyst with surgery. *Id.* Plaintiff also stated that she had to lie down most of the day because she had "a lot of trouble" sitting or standing for long periods of time and was "in a lot of pain." *Id.* Plaintiff testified that she saw Dr. Culclasure for pain management, and that she took morphine, Lortab, and Soma for muscle spasms in the back of her legs. *Id.* Plaintiff described the pain as being in her tailbone area, stated that she had the pain "all the time," and agreed with the attorney that it was "really bad." *Id.* Plaintiff testified that she could not prove that her injury was caused by her work, so she was not able to get

26

worker's compensation.  *Id.*

The attorney asked Plaintiff about her medications.  TR 368.  Plaintiff answered that she

suffered side effects such as feeling sleepy and drugged, having trouble concentrating, and

memory trouble.  *Id.*  The attorney then asked Plaintiff about her depression, and Plaintiff

answered that she was "very depressed because I can't work any more."  *Id.*

The attorney asked Plaintiff how much she could lift.  TR 368.  Plaintiff answered that

Dr. Arendall had told her she could only lift 10 pounds.  TR 369.  The attorney asked Plaintiff

about standing or sitting, and Plaintiff stated that she was "in bed most of the day," and had to lie

down after sitting or standing for 15 minutes.  *Id*.

### C.  Vocational Testimony

Vocational Expert ("VE"), Rebecca Williams, also testified at Plaintiff's hearing.  TR

366.  With regard to Plaintiff's past relevant work history, the VE stated that Plaintiff's past

work as a customer service representative for Bell South was classified as sedentary and

semiskilled with an SVP of 4.  *Id.*

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and

asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in

the past.[6]  TR 369.  The VE answered that the hypothetical claimant would not be able to work

---

[6] The ALJ's hypothetical asked the VE to assume an individual 42 years old with a high
school education, who was able to read and write English, able to add and subtract, had a
driver's license, who can operate an automobile, with past relevant work as a customer service
representative for the telephone company, which was sedentary and semiskilled, who could
occasionally lift 20 pounds, frequently lift 10 pounds, sit 6 hours in an 8-hour day, stand 6 hours
in an 8-hour day, needed a sit/stand-at-will option, had unlimited ability to understand,
remember locations and worklike procedures, sustain concentration and persistence, interact
socially, and respond appropriately to changes in the workplace setting.  TR 369.

as a customer service representative because they are not allowed to stand. TR 370. The ALJ then asked the VE whether there was any other work the hypothetical person could perform. *Id.* The VE stated that, in the State economy, at the light level, there were approximately 4,200 machine operators positions, 1,400 assembler positions, and 900 inspectors positions, all of which would be appropriate for the hypothetical claimant. *Id.* The VE further testified that, in the State economy, at the sedentary level, there were approximately 4,200 cashier positions, about 1,300 information clerk positions, about 1,000 receptionist positions, about 600 teacher's aide positions, about 5,200 sedentary assembler positions, and about 900 sedentary inspector positions, all of which would likewise be appropriate. TR 370-371. The VE also testified that there were about 1,600 jobs as a general laborer that would be available. TR 371.

Plaintiff's attorney then presented the VE with a medical source statement from Dr. Arendall, which limited Plaintiff to lifting 25 pounds occasionally and 10 pounds frequently, standing or sitting 15 minutes without interruption and 2 hours total in an 8-hour day, never climbing, balancing, stooping, crouching, kneeling, or crawling, limitations on pushing or pulling, and avoiding heights and moving machinery. TR 371. The VE testified that such limitations would preclude all work. *Id.* The attorney asked whether the limitations associated with the GAF score of 48 would affect the ability to work. *Id.* The VE answered that a person with a GAF of 50 or less would not be able to work. *Id.*

Plaintiff's attorney then asked the VE whether pain at a moderately severe level or worse would preclude work. TR 372. The VE said that it would, because it would impact the ability to concentrate, pay attention, remember, be aware of the environment, maintain safety in the workplace, work at a continuous pace, and maintain production. *Id.* The attorney asked the VE

whether medications with the same side effects the VE had just described and the need to lie down throughout the day for pain relief would preclude work, and the VE answered that it would. *Id.* The attorney asked the VE to assume Plaintiff's testimony was credible, and asked whether that would preclude work, and the VE stated that it would. *Id.*

### III.  CONCLUSIONS OF LAW

#### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270,

273 (6th Cir. 1997)). If the Commissioner, however, did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

> (2) If the claimant is not found to have an impairment which

30

significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[7] or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5) Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with

---

[7]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

31

particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

## C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ (1) failed to consider the combined effect of Plaintiff's impairments, (2) failed to consider the opinion of Dr. Killian and failed to accord sufficient weight to the opinion of Dr. Arendall, Plaintiff's treating physicians, (3) erroneously disregarded the limitations set forth by Dr. Gale, a consulting physician, (4) posed a flawed hypothetical question to the VE that rendered the ALJ's determination that Plaintiff retained an RFC for light work and had transferrable job skills erroneous, and (5) failed to consider the record as a whole, thereby rendering his decision unsupported by substantial evidence. Docket Entry No. 14. Plaintiff also contends that remand is warranted because she submitted new and material evidence to the Appeals Council that was not before the ALJ at the time of his decision. *Id.* Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

32

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1. Evaluation of the Combined Effect of All Impairments

Plaintiff contends that the ALJ failed to properly evaluate the combined effect of her impairments. Docket Entry No. 14. Specifically, Plaintiff argues that the ALJ failed to determine whether Plaintiff's combined impairments met or equaled a listed impairment. *Id.*

Plaintiff correctly asserts that the ALJ must evaluate the combined effect of her impairments. 42 U.S.C. § 423(d)(2)(B). Plaintiff, however, fails to show that the ALJ did not do so. Instead, Plaintiff simply maintains that the ALJ "did not make an effort" to determine whether Plaintiff's impairments, singularly or in combination, met or equaled a listing. Docket Entry No. 14.

The ALJ, after evaluating all of the medical, vocational, and testimonial evidence, determined that Plaintiff did not have an impairment or combination of impairments that met or equaled a listing. TR 33. The ALJ found that Plaintiff had "severe" impairments of low back pain and depression, but that these impairments were not severe enough to meet or medically equal the criteria of any impairment listen in Appendix 1, Subpart P of Regulations No. 4. TR

33

28.  In making this determination, the ALJ discussed the medical and testimonial evidence in great length and detail.  TR 23-29.  The ALJ determined that Plaintiff's low back pain was not severe enough to meet or equal a listing because objective medical evidence demonstrated that Plaintiff did not show significant spinal abnormalities following surgical removal of the left cyst, that she maintained full motor strength in her lower extremities, that her back was well-healed, that she had normal reflexes and gait, that there was no evidence of disc herniation, spinal stenosis, or degenerative disc disease, that there was no evidence of spinal cord or nerve root involvement, and that she could ambulate effectively without use of an assistive device.  TR 28.  Moreover, the ALJ noted that the objective medical evidence did not support Plaintiff's allegations of pain, and that Dr. Arendall's opinion that Plaintiff could not work conflicted with his notes that Plaintiff demonstrated full strength in all muscle groups and with a lumbar MRI showing a normal spine.  TR 30-31.

The ALJ determined that Plaintiff's depression did not meet or equal a listing because Plaintiff had neither taken antidepressants as prescribed nor pursued psychiatric treatment since 1999.  *Id*.  In making his determination, the ALJ also extensively discussed Plaintiff's activities of daily living, her ability to interact appropriately and communicate effectively with others, her ability to sustain focused attention sufficiently long to permit timely completion of tasks commonly found in work settings, her ability to adapt to stressful circumstances, and her ability to function independently.   TR 28-29.  The ALJ noted that Plaintiff had reported symptoms of depression, but had not experienced hallucinations, delusions, or paranoid thoughts, and had reported interaction with friends and family.  *Id.*  The ALJ additionally noted that Dr. Gale had evaluated Plaintiff's thought processes and cognitive ability as within normal limits and her

34

ability to sustain concentration and persistence as without significant limitations.  TR 29.

It is clear from the ALJ's detailed articulated rationale that the ALJ considered the record as a whole in evaluating the combined effect of Plaintiff's impairments.  Plaintiff's argument fails.

## 2.  Weight Accorded to the Opinion of Plaintiff's Treating Physicians

Plaintiff maintains that the ALJ did not consider the opinion of Dr. Killian, and failed to accord sufficient weight to the opinion of Dr. Arendall, her treating physicians.  Docket Entry No. 14.

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
> (1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> (2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...
> (3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for

35

an opinion, the more weight we will give that opinion. ...
          (4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.
          (5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

20 C.F.R. § 416.927(d) (emphasis added).  *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 C.F.R. § 404.1502.

With regard to Plaintiff's contention that the ALJ did not consider the opinion of Dr. Killian, the ALJ, in his decision, extensively discussed Dr. Killian's treatment of Plaintiff.  TR 24-25.  Because the ALJ specifically discussed Dr. Killian's treatment of Plaintiff, Plaintiff's contention that the ALJ failed to consider Dr. Killian's opinion is unsupported by the Record.  Plaintiff's argument on this point fails.

With regard to Dr. Arendall's opinion that Plaintiff was "medically disabled," the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled because finding a plaintiff to be disabled is an administrative issue that requires familiarity with legal as well as medical requirements (*see* 20 CFR 404.1527(d)(2) and 416.927(d)(2); SSR 96-5p), and the definition of disability requires consideration of both medical and vocational factors (*see, e.g., King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Hall v. Bowen*, 837 F.2d 272, 276 (6th

36

Cir. 1988)). For this reason alone, Dr. Arendall's opinion that Plaintiff was "medically disabled" cannot be given controlling weight.

Moreover, as the Regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above. *Id.* When the opinions of treating physicians are inconsistent, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. § 416.927(e)(2).

Dr. Arendall treated Plaintiff for an extensive period of time, a fact that would normally justify the ALJ's giving greater weight to his opinion than to other opinions. As the ALJ noted, however, Dr. Arendall's opinion that Plaintiff was "medically disabled," is not entitled to controlling weight because it is an administrative finding reserved for the Commissioner, and it contradicts other evidence of record, including his own examination notes. TR 30. Despite opining that Plaintiff was "medically disabled," Dr. Arendall reported, *inter alia*, that Plaintiff did not have significant spinal abnormalities, that she maintained full motor strength, that her back was well-healed, that she had normal reflexes and gait, that there was no evidence of disc herniation, spinal stenosis, or degenerative disc disease, that there was no evidence of spinal cord or nerve root involvement, and that she could ambulate effectively without use of an assistive device. TR 28.

Because Dr. Arendall's opinion that Plaintiff was "medically disabled" is an administrative finding reserved for the Commissioner, and because his opinion contradicts other

evidence of Record, the Regulations do not mandate that the ALJ accord Dr. Arendall's opinion controlling weight. Accordingly, Plaintiff's argument fails.

### 3. Weight Accorded to the Opinions of Consulting Physicians

Plaintiff maintains that the ALJ erroneously disregarded the limitations described by Dr. Gale, a consulting physician. Docket Entry No. 14. Plaintiff also argues that the ALJ failed to consider the opinion of Dr. Walker, a second consulting physician. *Id.*

As an initial matter, the opinion of a consulting physician is not entitled to the deference due the opinion of a treating physician, per the regulations discussed above. *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). Furthermore, although the Secretary cannot simply disregard the opinions of a consulting physician which are favorable to a claimant (*Lashley v. Secretary*, 708, F.2d 1048, 1054 (6th Cir. 1983)), the opinion of a consulting physician is not substantial evidence if it is contrary to other evidence in the record (*see, e.g., Miracle v. Celebrezze*, 351 F.2d 361, 378-379 (6th Cir. 1965)).

The ALJ, in his decision, noted that Dr. Gale had diagnosed Plaintiff with Depressive Disorder NOS and Anxiety Disorder NOS, and had assigned Plaintiff a GAF of 48, indicating a serious impairment of social and occupational functioning. TR 27. The ALJ further noted, however, that Dr. Gale also indicated that Plaintiff did not demonstrate major indicators of anxiety, had only mildly impaired memory, had a logical thought process with no indication of delusions, hallucinations, or paranoia, had normal concentration and cognitive ability, could understand, remember, and carry out work-like procedures, could sustain concentration and persistence, could interact socially without marked limitations, and should be able to respond appropriately to changes in the workplace. *Id.* Accordingly, the ALJ ultimately found Dr.

38

Gale's assessment of Plaintiff's functional ability to be unsupported by his own examination notes. TR 30-31.

Because Dr. Gale's opinion was internally inconsistent and inconsistent with other evidence in the record, the Regulations do not require the ALJ to accord it significant weight, and Plaintiff's argument on this point fails.

Plaintiff is correct in her assertion that the ALJ did not discuss Dr. Walker's consultative evaluation. Dr. Walker's evaluation opined that Plaintiff was not significantly limited in any areas with the following exceptions: Dr. Walker opined that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, her ability to carry out detailed instructions, her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances,[8] her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and her ability to interact appropriately with the general public. TR 234-235. Dr. Walker concluded that Plaintiff was "Otherwise not mentally limited." TR 235.

As has been noted, Dr. Walker was a consulting physician. As such, his opinion is to be considered, but is not automatically accorded controlling weight. Dr. Walker, in his evaluation, determined that Plaintiff was not significantly limited in 16 out of 20 areas, was moderately limited in 4 out of 20 areas, and was not markedly limited in any area. As will be discussed in greater detail below, substantial evidence (including Dr. Walker's own evaluation) supports the

---

[8]With regard to this category, Dr. Walker indicated both "not significantly limited" and "moderately limited." TR 234.

ALJ's determination that Plaintiff was not disabled within the meaning of the Act and Regulations. The ALJ's failure to discuss Dr. Walker's consultative evaluation, therefore, is harmless error and does not warrant remand or reversal.

## 4. Hypothetical Question Posed to the VE and it's Effect on the ALJ's Determination of Plaintiff's RFC

Plaintiff also argues that the ALJ erred in posing a hypothetical question to the VE that did not include the findings contained in Dr. Walker's evaluation, that did not "address the erosion of the light work base due to the effect of the sit/stand option,"and that did not include the effect of Plaintiff's medication. Docket Entry No. 14. Plaintiff contends that these errors render the ALJ's determination that Plaintiff retained an RFC for light work unsupported by substantial evidence. *Id.*

As has been noted, the ALJ did not discuss Dr. Walker's evaluation in his decision. Accordingly, it is unknown whether the ALJ considered Dr. Walker's evaluation. As has also been noted above, however, Dr. Walker's evaluation determined that Plaintiff was not significantly limited in 16 out of 20 categories. TR 234-235. Although Dr. Walker determined that Plaintiff was moderately limited in 4 categories, he did not find Plaintiff to be markedly limited in any way, and he ultimately concluded that she was not mentally limited. *Id.* Dr. Walker's opinion is consistent with the ALJ's determination that Plaintiff retained an RFC for light work. Accordingly, the fact that the ALJ did not discuss Dr. Walker's evaluation does not provide a basis for remand.

Plaintiff argues that the ALJ's questioning of the VE was flawed because it did not "address the erosion of the light work base due to the effect of the sit/stand option." Docket

40

Entry No. 14.  Plaintiff also argues that the inclusion of a "sit/stand option would clearly erode the sedentary work base."  *Id.*

The ALJ posed the following hypothetical to the VE:

> I want you to consider that we have a hypothetical person, we're going to assume that this individual is 42 years of age, has a high school education, can read and write English, can add and subtract, has a driver's license, can operate an automobile.  Assume her past relevant work has been that of a customer service representative for the telephone company, which would be sedentary and semiskilled.  Assume that this individual would be able to occasionally lift 20 pounds, frequently lift 10 pounds.  Could sit approximately six hours in an eight-hour day, stand approximately six hours in an eight-hour day.  *Would need a sit/stand at will option.*  And assume further that her ability to understand and remember locations and work like procedures is not limited.  The ability to sustain concentration and persistence is not significantly limited.  The ability to interact socially is not limited.  And she can respond appropriately to change in the workplace setting.

TR 369 (emphasis added).

As can be seen, the ALJ's proffered hypothetical included Plaintiff's need for a sit/stand-at-will option.[9]  As such, the VE's response regarding appropriate positions took into account this limitation, and Plaintiff's argument fails.

Plaintiff further contends that the ALJ's hypothetical was flawed because it did not include the effect of Plaintiff's medication.  Docket Entry No. 14.  While Plaintiff is correct that the ALJ did not question the VE regarding the effect of Plaintiff's medication on the availability of the stated jobs, Plaintiff's attorney asked the VE whether medications with the same side

---

[9] Additionally, the ALJ, in his decision, specifically found:  "The claimant could also sit for 6 hours and stand/walk for 6 hours in an 8-hour workday but *would need the option to alternate sitting and standing throughout the workday*."  TR 31 (emphasis added).

effects the VE had just described[10] would preclude work, and the VE answered that it would.  TR 372.  Accordingly, the ALJ heard testimony regarding the effect of Plaintiff's medication on the availability of the stated positions, and he had that information before him at the time he rendered his decision.  The fact that it was Plaintiff's attorney, and not the ALJ, who proffered the query regarding the effect of Plaintiff's medication on the availability of the stated positions is inapposite and does not warrant reversal or remand.

Plaintiff maintains that the averred errors with the hypothetical question discussed above render the ALJ's finding regarding Plaintiff's RFC unsupported by substantial evidence.  Docket Entry No. 14.  The ALJ determined that Plaintiff retained the RFC for light work.  TR 31.  Specifically, the ALJ found:

> She could lift and carry 20 pounds occasionally and 10 pounds frequently.  The claimant could also sit for 6 hours and stand/walk for 6 hours in an 8-hour workday but would need the option to alternate sitting and standing throughout the workday.  The claimant's ability to remember, understand, and carry out instructions is not significantly limited.  She is able to maintain adequate concentration, persistence, and pace and is not significantly limited in her ability to deal with the general public, co-workers, or supervisors.

TR 31.

As has been discussed above, each of Plaintiff's claims regarding the ALJ's proffered hypothetical fail.  Plaintiff's averred errors do not impact the ALJ's determination that Plaintiff retained the RFC for light work, which was supported by substantial evidence.

"Residual Functional Capacity" is defined as the "maximum degree to which the

---

[10] The "side effects" to which Plaintiff's attorney refers are as follows: "the ability to pay attention, to remember, to be aware of your environment, to maintain safety in the workplace, to interfere with the ability to work at a continuous pace, [and to] maintain production."  TR 372.

individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c). With regard to the evaluation of physical abilities in determining a claimant's Residual Functional Capacity, the Regulations state:

> When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

20 C.F.R. § 404.1545(b).

The ALJ considered the testimonial evidence, doctors' evaluations, medical assessments, and test results in reaching his determination that Plaintiff retained the RFC for light work. After considering and rejecting Dr. Arendall's and Dr. Gale's conclusions as to Plaintiff's degree of disability because of the internal inconsistencies in their records, the ALJ properly utilized the results of CT and MRI studies, physicians' examination notes, and testimonial evidence to support his determination. TR 28-32. The ALJ properly evaluated the evidence in reaching this Residual Functional Capacity determination, and the Regulations do not require more. There is substantial evidence in the record to support the ALJ's RFC determination; the ALJ's determination must stand.

## 6. Substantial Evidence

Plaintiff contends that the ALJ did not consider the record as a whole in making his findings, and that his decision is therefore not supported by substantial evidence. Docket Entry No. 14.

43

As explained above, "substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion," *Her*, 203 F.3d at 389 (*citing Richardson*, 402 U.S. at 401), and has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell,* 105 F.3d at 245 (*citing Consolidated Edison Co.,* 305 U.S. at 229).

As has been discussed, the record here is replete with doctors' evaluations, medical assessments, test results, and the like, all of which were properly considered by the ALJ, and all of which constitute "substantial evidence." Additionally, the ALJ's decision demonstrates that he carefully considered the testimony of both Plaintiff and the VE. While it is true that some of the testimony and evidence supports Plaintiff's allegations of disability, it is also true that much of the evidence supports the ALJ's determination that was not disabled within the meaning of the Social Security Act.

The ALJ considered Plaintiff's testimony at the hearing, as well as her answers to pain questionnaires on record. TR 23. The ALJ reviewed the medical evidence on file in detail, summarizing treatment for back pain and depression by Dr. Killian, Dr. Arendall, Dr. Culclasure, Ms. Worrell, and Dr. Gale, including medication and objective medical test results. TR 24-27. The ALJ further noted evidence of Plaintiff's physical therapy treatment and her consultative physical examination by Dr. Davis. TR 25. Moreover, the ALJ considered the VE's testimony that an individual with Plaintiff's limitations would be able to adjust to other work, and about the number of suitable jobs existing in the state economy. TR 32.

As has been noted, the reviewing court does not substitute its findings for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences.

44

*Garner*, 745 F.2d at 387. In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key*, 109 F.3d at 273). The ALJ's decision was properly supported by "substantial evidence;" the ALJ's decision, therefore, must stand.

## 7. New and Material Evidence

Plaintiff also argues that Plaintiff's letter addressing the ALJ's findings, Dr. Arendall's deposition, and additional treatment records from Neurological Associates dated July 14, 2003, through April 19, 2004 (TR 337-360) constitute new and material evidence, and that the Appeals Council must accept review of the ALJ's decision when new and material evidence is submitted. Docket Entry No. 14. Plaintiff further maintains that remand is warranted pursuant to Sentence Six of 42 U.S.C. § 405(g) to consider the new evidence submitted to the Appeals Council. *Id.*

On January 29, 2005, the Appeals Council recorded its receipt of additional evidence consisting of Exhibit AC-1, a record of a September 14, 2001, Workers Compensation hearing[11] (TR 337-340); Exhibit AC-2, treatment records from Neurosurgical Associates from July 14, 2003, through April 19, 2004 (TR 341-352); and Exhibit AC-3, a letter from Plaintiff's representative, dated November 6, 2003, with a statement from Plaintiff attached (TR 353-360). TR 10. The Appeals Council incorporated this additional evidence part into the record. TR 10, 337-360.

The regulations provide that where new and material evidence is submitted with the request for review, the entire record will be evaluated and review granted where the Appeals

_____

[11] The record reveals that Exhibit AC-1 is actually the deposition of Dr. Arendall, as Plaintiff correctly asserts. TR 337-339.

45

Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence. 20 C.F.R. § 416.1470. After reviewing Plaintiff's submissions and the record as a whole, the Appeals Council determined that there was no basis under the regulations for granting Plaintiff's review. TR 7-8.

Remand for consideration of new and material evidence is appropriate only when the claimant shows that: (1) new material evidence is available; *and* (2) there is good cause for the failure to incorporate such evidence into the prior proceeding. *Willis v. Secretary*, 727 F.2d 551, 554 (6th Cir. 1984). Plaintiff can show neither.

Plaintiff must first demonstrate that her submissions are "new." The undersigned notes that Dr. Arendall's deposition is dated September 14, 2001, nearly 21 months prior to Plaintiff's June 27, 3003 hearing; Dr. Arendall's deposition clearly is not "new." Although the statement written by Plaintiff and submitted to the Appeals Council is dated November 6, 2003, it essentially reiterates the content of the record that was before the ALJ at the time of the hearing and is, therefore, likewise not "new." With regard to Plaintiff's treatment records dated July 14, 2003, through April 19, 2004, those records did not exist at the time of Plaintiff's hearing.

Plaintiff must also demonstrate that the evidence she submitted is material. "In order for the claimant to satisfy her burden of proof as to materiality, she must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Secretary*, 865 F.2d 709, 711 (6th Cir. 1988) (*citing Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir. 1980)). Plaintiff has failed to satisfy this burden. Dr. Arendall's deposition and Plaintiff's statement essentially repeat the information of record, and do not add to the evidence the ALJ considered. TR 337-

339, 354-360.  The medical records from July 14, 2003, through April 19, 2004, include a new

prescription for the pain medication Oxycontin (TR 342), but earlier medical records considered

by the ALJ also include numerous prescriptions for pain medication and are similar in content to

the new records.  Because the record before the ALJ was essentially the same, Plaintiff has failed

to demonstrate that "there was a reasonable probability that the Secretary would have reached a

different disposition of the disability claim if presented with the new evidence."  Accordingly,

Plaintiff cannot establish that her submissions are material.

   Furthermore, Plaintiff must demonstrate good cause for failing to present the evidence for

incorporation into the prior proceeding.  Plaintiff's proffer of "good cause" is that the "new"

evidence did not exist at the time of the June 27, 2003, hearing.  Docket Entry No. 14.  Plaintiff's

assertion is true, however, only with regard to her July 14, 2003, through April 19, 2004,

treatment records.  As has been discussed, Dr. Arendall's deposition is dated September 14,

2001, nearly 21 months prior to the hearing; Plaintiff offers no explanation of why she did not

previously submit it to the ALJ.  TR 337, Docket Entry No. 14.  Additionally, although the

statement written by Plaintiff and submitted to the Appeals Council is dated November 6, 2003,

it essentially reiterates the content of the record available to the ALJ and does not contain

information that could not have been submitted at the time of the hearing.  TR 355-360.  While

the July 14, 2003, through April 19, 2004, medical records were clearly not in existence at the

time of the June 27, 2003 hearing, and contain a new pain prescription and letter from Plaintiff's

treating physician, they do not reveal any significant changes in Plaintiff's condition.  TR 341-

352.

   Plaintiff has failed to demonstrate either that her submissions were new and material or

that there was good cause for her failure to present that information at the administrative hearing. Accordingly, remand pursuant to Sentence Six of 42 U.S.C. § 405(g) is not warranted.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's "Motion for Judgment" be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

_____
E. CLIFTON KNOWLES
United States Magistrate Judge